Case number 15-1246, Sierra Club et al. Petitioners v. Environmental Protection Agency and Katherine McCabe, Acting Administrator, U.S. Environmental Protection Agency. Mr. Gromley for the petitioners, Ms. McDonough for the respondents. Good morning. Good morning. Neil Gormley for petitioners, Sierra Club and California Communities Against Toxics. May it please the Court. This case is a challenge to EPA's claim to have satisfied its obligations under Section 112C6 of the Clean Air Act. This Court considered EPA's previous claim to have satisfied its obligations under Section 112C6 in the 2012 Sierra Club decision, and it held there that EPA's determination was reviewable and that Sierra Club's challenge to the determination was timely. The only issue in this case not resolved by Sierra Club is the lawfulness of EPA's new claim to have set standards for three of the Section 112C6 pollutants through surrogates. Because EPA's new surrogacy claims fail the test established by decisions of this Court for determining whether a surrogate is reasonable, the Court should reject EPA's new surrogacy claims and vacate the determination. So when the original rule was promulgated, for example, where you say that the identification of the surrogate and its role was inadequate, what was your understanding of what EPA had to show with regard to setting the standard? In other words, I want to be clear whether your concern is really as to the standard or to the activity or the nature of the surrogate and its interrelationship with the other pollutants and the HAP in particular, the C6 HAP in particular. Our concern here is about the surrogacy relationships that EPA has identified, purported to identify for the first time in this determination. Our concern with the prior rules would be that they didn't even purport to set the standards. So give me an example, a specific example. Well, one example would be the prior rules for Coke ovens. Coke ovens were regulated originally for other pollutants long ago, before EPA even issued its initial inventory of the 112 C6 pollutants. So it was not regulating at that point for any of the C6 pollutants? It was not regulated, not as far as I know, and it was certainly not regulated. That qualification is key to me here. Yes, I understand, Judge Rogers. What I mean to say is that it did not set standards. It did not purport to set standards for the C6 pollutants that are at issue in this case. What was it doing? It was setting standards only for other pollutants. In that case – So there's some overlap between 112A and C6 as to the pollutants, correct? There is some overlap. Certainly other provisions of the Clean Air Act do impose obligations with respect to the same sources. But Section 112C6 requires standards under D2 or D4 for the seven pollutants named in Section 112C6. And there's no reference to any of those in the Coke ovens rule, is your point? The Coke ovens rule did not even purport to set standards for POM, PCBs, or HCB for the 112C6 pollutants at issue here. And that's true for all of the 17 source categories that we have identified in our opening brief. The prior rules for those source categories did not even purport to set standards either directly or through a surrogate for the 112C6 pollutants. And all of it today we're talking about is surrogacy, right? That's exactly right, Judge Sentelle. EPA's new surrogacy claims, which appear for the first time in the Section 112C6 determination under review. Can you tell me when the EPA first floated this concept of regulation through surrogacy, whether for C6 or anything else? I know we have a National Line case, but was that the first time the EPA itself had ever tried this concept of surrogacy regulation under the Clean Air Act? I'm not sure of the answer to that, Judge Millat. I don't know when the first time EPA claimed authority to set standards through surrogates. I do know that it did not claim to be setting standards through surrogates for POM, HCB, or PCBs, the three Section 112C6 HAP, when it issued prior rules for these. So the first time it ever claimed surrogacy for these three pollutants was, I guess, probably in the determination? Yes, that's right. The first time that EPA claimed to be setting standards through surrogates for these pollutants from these sources was in this determination. So, let me just follow up on that. If you were to go to the Coke ovens rule and look at the preamble and all of the technical documents, is it your point that you would simply not find anything that would support what I'll call the National Line analysis for a surrogacy for any of the C6 pollutants? If you understand what I'm saying. In other words, they didn't say it explicitly. But if you looked at the rulemaking itself, you would see, in my hypothetical, that obviously that's what was happening. No, Judge Rodgers, you would not find that, that obviously that was what was happening if you looked at the prior rules. And if EPA... So let me just ask you, why would an agency proceed this way? What the agency actually did here is it articulated new surrogacy determinations, in this case, in the determination under review. And the reason EPA proceeded that way, the reason why it didn't set standards for the C6 HAPs at the time, is because, for many of these rules, it didn't have an obligation to set standards for under 112C6 until November 15, 2000. And in subsequent rules, EPA should have, but didn't. Another point I'd like to make on the timeliness issue is that this Court's 2012 Sierra Club decision expressly rejected the argument that a challenge to EPA's 112C6 determination was an attack on prior rules. Well, but let me understand it. In other words, if your petition is granted, do you contemplate that, for instance, for Coke ovens, assume everything that you said is correct and that my hypothetical is correct, that the rulemaking doesn't itself demonstrate the obvious nexus and necessary interaction to meet the national line test? Would EPA have to reopen the rule or simply do a new rulemaking for purposes of this listing? EPA could just do a new rulemaking. That just is, I mean, that's what EPA may be trying to avoid. Is there something less than that? All EPA would be required to do in order to fulfill its Section 112C6 obligations would be to set standards for the 112C6 hazardous air pollutants for which it has not yet set standards, either directly or through a valid surrogate. Does that mean it would not, as to the existing emission standards for the surrogates, your position is those wouldn't have to be altered, I take it? Those are, whatever they are, whatever, I don't know my chemistry enough to give you the name of a surrogate, but whatever surrogate they're regulating or whatever that they're using, you're not challenging that emission standard. You want to, you say they've got to overlay on top of that specific standards that meet MAC requirements for the C6. That's exactly correct. You're not attacking the existing emission standards. You're just saying there's missing, there's a hole, there's a gap that needs to be filled. That's exactly right. There's a gap for the Section 112C6 hazardous air pollutants. And it would follow that the time of this determination would not be based on the adoption of those standards, but on the new application concerning the C6 pollutants. That's exactly right, Judge Sintel. But what about, you've given a couple examples in your brief where you say that with respect to the surrogate, the standards that were used there to address the emission of that surrogate actually had the consequence of increasing release of a C6 pollutant. Now, how, when you saw an old emission standard come out regulating surrogate X, that had the consequence back then and there of increasing pollution of a C6 standard, whether they called it surrogate or not, wouldn't you have been able to argue back then that that was a violation of the Clean Air Act because they were increasing pollution of a C6 standard? Whether they called it a surrogate or not, you saw the consequence of what was happening. It's certainly possible that in some of the prior rules, that some of the prior rules were unlawful under other provisions of the Clean Air Act. But the question here today is whether those prior rules satisfy EPA's obligations under Section 112C6. But wouldn't you have known when you saw the C6 pollutant increasing in amount, wouldn't you have known back then that they were transgressing the Clean Air Act C6 as well as just the C1 and B1 listing process? Well, we wouldn't have had that information at the time. What we've done in this determination is we've built a record in response to EPA's claim that standards for other pollutants are surrogates for the 112C6 pollutants. The record in this rulemaking that has been assembled establishes that, in fact, controls for the claimed surrogates may increase emissions. I see. So the old record, because they weren't doing surrogacy determinations in the old record, they wouldn't have even had a record on the impact of those regulatory emission standards on the C6 pollutants. Is that your point? That's exactly right, Judge Millett. Most, although there are occasional mentions of the Section 112C6 pollutants in the prior rules, most of them do not mention the 112C6 pollutants at all, and none of them purported to be setting a standard for those pollutants under 112D2 or D4, either directly or through surrogates. But you leave open the possibility, as I understand it, that you might have been able to raise some of these issues early in some instances. I mean, if the agency mentions C6 and they've got a whole technical document talking about C6 and whatever the surrogate is, I mean, that counsel may not have raised it as a matter of strategy, but the record made it plain there was a problem. No, Judge Rogers, none of the prior rules did what you just said. None of the prior rules discussed C6 or put together a technical document with respect to the C6 pollutants. None of the prior rules purported on their face to set standards directly or through surrogates for the C6 pollutants. But you see what I'm getting at. I mean, you're as familiar with this as I am, that there are lots of technical documents associated with these rules. They discuss something and address it and explain the agency's analysis and its conclusion, but it doesn't actually, that conclusion doesn't actually appear on the face of the rule because it's not necessary for whatever reason. So, I mean, you leave open the possibility that if you delve into these records, maybe not everything is unlawful for purposes of this listing. We don't believe that the prior rules contain the kind of discussion that you're alluding to, Judge Rogers. But hypothetically, it could exist. Hypothetically, it could exist, and if it did exist, then EPA in a subsequent rulemaking could rely on that, just as EPA could have done here in this determination. So that's what I'm trying to get at. In my hypothetical, say in the Coke ovens rule, there's a big technical document talking precisely about C6 pollutants and precisely talking about the interaction of what is now identified as a surrogate. And just hypothetically, from your client's position, that is all that you think was required for this C6 listing. It's not as though the agency would necessarily have to do a new rulemaking. That's what I'm trying to understand. Or you think that the agency, and by new rulemaking, I'm talking about the old rules. I'm not talking about this listing. What EPA would be required to do is a new Section 112C6 determination, and in that determination, it could point to where in the old rules it believed it had established surrogates. Okay. So your point is they haven't argued that here or done that in this rule. That's exactly right. What EPA has done is it has claimed it has purported to establish new surrogacy relationships, and those new surrogacy relationships, which EPA has advanced in this rulemaking, and it has done that here. It did that extensively in the proposed rule, and we are challenging those surrogacy determinations. Would they have to? Go ahead. What's our standard of review for reviewing that determination? It would be an arbitrary and capricious standard of review, Judge Santel. You say there is not sufficient record for a reasonable commission to have made this determination based on what was in the record. We do. That's right, but that's not our only objection to the new surrogacy determinations. Our primary objection is that they don't even purport to meet the test established by decisions of this court for what is a reasonable surrogate. As this court has made clear now on multiple occasions, a surrogate, to be reasonable, must be sufficiently well correlated with the target hazardous air pollutant to enable EPA to identify the best performers with respect to the target hazardous air pollutants and to enable EPA to determine what is the achievable reduction with respect to the hazardous air pollutants. EPA doesn't even claim that its surrogates meet that test, and the record shows that its surrogates don't meet that test. As you pointed out, Judge Millett, the record, in fact, reveals that methods to control the alleged surrogates do not control the target hazardous air pollutants and may even increase them. And conversely, methods to control the target hazardous air pollutants do not control the alleged surrogates and may actually increase them. And for that reason, EPA's new surrogacy claims should be rejected. I'd like to make maybe one more point on the notice and comment issue. EPA actually solicited comment on its new surrogacy claims, but then EPA refused to address comments, questioning the reasonableness of the surrogacy relationships identified for the first time in this rulemaking. And the comments that EPA refused to address go to the heart of the record rationale for this determination, which is, again, the new surrogacy claims. And one final point on that. Both this court and the district court have held that EPA is required to conduct notice and comment on a 112c6 determination and that that notice and comment must render its legal and technical decisions more transparent and facilitate substantive review of the 112c6 determination. EPA's refusal to consider comments questioning the reasonableness of its new surrogates not only violated the requirement of reasoned decision-making, but the judgments of both this court and the district court. If there are no further questions, I'll save my time for rebuttal. All right. Thank you. Good morning. Good morning, Your Honors. I'm Eileen McDonough for the respondent, EPA.  widely different positions on what is at issue before the court in this matter. I'd like to start with the discussion of this court's prior decision, where it remanded for notice and comment, where the court discussed the timeliness argument. What the court said there is that EPA is, they recognized or described Sierra Club's argument as a claim that EPA has unlawfully shoehorned prior regulations to meet the purposes of 1C6. And that if they were correct, that argument would be timely. So that's the question that's before this court, is whether the rule at issue did improperly shoehorn prior regulations to meet the 1C, the C1, I'm sorry, the C6 requirements. And what do you think we meant by shoehorn? I think what you meant was whether EPA was relying on regulations that would not encompass the purpose of 1C6. And I think that the primary way to look at that and to realize that it's not a valid argument is to look at Section 7412 as a whole. Plaintiffs look at C6 as an independent unit without placing it in the context. Before you get there, though, I want to point you to some other language in our opinion that I'm having trouble understanding how you interpret here on the timeliness question, and that is on page 535 of the decision. In response to the argument, they're talking about legislative rule or not, but what we held in the bottom of the left column is that this determination tread new ground by taking previous rulemakings, which EPA had promulgated, without any evident goal of satisfying its 112C6 obligation and repurposing them to satisfy 1112C6. That manifests a new yet final agency opinion on its compliance with 112C6, and because it's legislative, you had to go through notice and comment. That argument to me, that reasoning there seems to me to be a pretty direct holding that what you've done here is new final agency action, now done through proper legislative rulemaking procedures of notice and comment. That is a distinct new agency action that can be timely challenged. Do you disagree with that? It is a distinct agency action, but the question is whether in order to contend that EPA is improperly relying on arguments, what the court has to do is look back at the entire statute and how these regulations came to be. The argument that you are repurposing them to satisfy 112C6, repurposing old rules to satisfy 112C6, seems to me isn't that exactly their surrogacy argument? That is part of what they're saying, but then that has to be reconciled with the timeliness section of the court's session, and at no point did the court say that it could go back and reopen all of the old rulemakings. They just said they don't need to reopen those. They're perfectly fine for what they regulate. The problem is that there's a gaping hole there. The C6 determinations, the MACT determinations for C6 pollutants are nowhere to be found. The problem is in the timing. When you look at the other provisions of Section 7412, with respect to major sources, which are the sources at issue here, Section C6 does not require or impose any new obligations with respect to the regulation of those rules. What it says is that in C1, EPA had established a list of major categories. Then in B1, they had established a list of pollutants, which includes the pollutants at issue here in C6. Yes, but doesn't C6 mean that we have to – I mean, I'm assuming it wasn't entirely redundant. If they're all major sources already, then it's not adding anything. Doesn't it mean that we have to make a specific MACT determination for each of those C6 pollutants? EPA has to do that on a record that is reviewable for notice and comment rulemaking, and that hasn't happened here. What C6 adds is, by dint of the 90% requirement, it means that EPA cannot rely on – in some instances – let me start over. In some instances, in order to hit the 90% threshold, which is the new part of C6, EPA is going to have to go beyond the universe of the major sources. Right, and get the area sources. And they're going to have to go down into area sources. I get that, right. And area sources are not normally required to be subject to MACT standards. There are lesser standards that they can be used. Yes. So the independent significance of C6 is that it broadens the universe that must be subject to MACT standards in order to ensure that the 90% threshold is reached. But the major sources were already supposed to be subject to MACT standards for all pollutants emitted by those source categories that were listed. When did you first try out this concept of surrogacy for C6? Surrogacy is simply another way of saying that – another means of setting a standard. I'm going to try one more time. When? Was first – National Lyme, the first one? It was in National Lyme. That was in 2000, and it was – I believe it may have been used in rulemakings prior to those challenged in National Lyme. But the main point, again – You don't know when exactly you first used it for C6 before? No, I don't. But the main point that I'm trying – Go ahead. I'm sorry. The main point that I'm trying to get at is that those standards promulgated back in the 90s and in 2000, by statute, were supposed to cover all of the C6 pollutant and was supposed to cover them for all major sources. If anyone had believed that these standards did not meet that requirement, they should have challenged back then. So to the extent that the Coke ovens were considered – petitioners were concerned that they didn't adequately cover a C6 pollutant, they should have come to the court then and argued that one of the pollutants is not – Well, what if EPA was saying we're not purporting to meet our C6 obligations through these? What would happen then? In 1998, EPA published a list of the categories that it intended to regulate to meet its obligations under C6 and also identified the pollutants that they would be covering. So at that point, everybody was on notice of what EPA intended to do to meet its obligation. Petitioner Sierra told them – Continue to do. Continue to do. You're not claiming that in the Coke oven regulations, they actually said we have done so for you. What I'm saying is that in the Coke regulations, they said they covered all of the pollutants that were listed pursuant to 74B, which would cover these as well. That would include the C6 pollutants as well? Yes. That list includes the C6. But the rule itself never mentioned the polycyclic organic matter. Didn't mention it at all. Right. Didn't mention C6 at all. I don't know that it – it did not mention C6. I don't know what it said about the polycyclic. Well, I know that 89 and 93 did not mention polycyclic organic matter. If that was an issue, it should have been raised. That is on the list of the pollutants under 81. That didn't answer the question. Did it mention it? You say it should have been raised then, but that's a conclusion. You're being asked about a fact upon which that conclusion is not raised. Yeah, and as I said – They didn't make a reference to this polycyclic wasteware. I can't answer that question. But, again, since that – If you're questioning that it's not timely, shouldn't you be able to answer that question for us? I don't believe so because the question is what should have been raised. By definition – The question behind that one is what did you put in the rules? What did your agency put in the rules? Didn't the commission put in the rules? For present purposes, Your Honor, we can assume that they did not. Okay. To get past and to answer the question. But in the municipal waste one, you had originally even raised in a proposed rule that you were going to be getting one of the C6 elements. And then in comments in response to that proposed rule, you said, Contrary to comments mentioned, EPA did not purport to use other pollutants emitted by the large MWC as surrogates for PCB and POM. So there, if your theory is right, your original rule there would have been covering all this. But then you have comments that are telling the world, No, no, no, we're not purporting to get these things through surrogacy. And then now you've got a determination that we got those things through surrogacy. So it seems to me it's a little bit of whack-a-mole going on here with what you're doing. We didn't do it. We didn't say we do it. Oh, you should have known we're doing it. But even when someone asked, we said we weren't doing it, but we mentioned it. Or maybe we didn't even mention it at all, but you should have known. And we've had all this litigation about the need for this determination about surrogacy. We have law on what you have to show to establish surrogacy to satisfy C6. And they just want to challenge that. And I just don't understand why. Why they were supposed to do it before you even had the concept of surrogacy out there for anybody to know about. Surrogacy is simply another way of regulating or setting a standard. If you're supposed to cover all of the pollutants, then that can be done directly or by surrogacy. And if it was not done in the original rulemaking, it should have been bought up then. Unless EPA was saying, Well, no, no, we're not there yet. And that's why we have litigation about you haven't done your job yet under C6. Well, that's why we have litigation. But that doesn't answer the question as to whether the purpose of the litigation is to reopen the old rules and decide whether or not they actually met the obligations under D. They say they don't have any interest in reopening the old rules. You just have another job that needs to be done here and hasn't been done, at least. I mean, maybe you have if you made the record to show the surrogate. I don't mean to jump ahead. Maybe you could show the surrogacy actually work. And so you actually have done the job. But you haven't done that job yet. In order to say additional work is necessary, what the court would have to say is that the original rule did not meet its obligations. No, here's what I want to say. Okay. Do you agree that to use a surrogate to satisfy C6, you have to establish the reasonableness of that surrogate under our precedent? Do you agree with that? I do. Okay. Do you agree that none of those prior rules met our standard for establishing surrogacy? Many of them did not. Can you tell me which of them did? Well, what I will say is that this is limited to a specific number of rules identified by the petition. So which of these rules do you think met our national LIME standard? We'll say for this argument, and I understand that this is binding for the opinion, that they did not. Okay. But again, what you would have to do. No, no. I just want to go through this. We have a standard for surrogacy. None of your rules met that surrogacy. None of them told anybody that surrogacy, they were meant to do the job of satisfying C6 via surrogacy until the determination came out. Then the public was on notice that, oh, you thought those satisfied C6, even though they didn't mention the HAP, you thought they did it via surrogacy. We didn't know that. But now that you've made this determination, we're on notice of what you've done, and we're challenging that surrogacy determination. We're not challenging your direct regulations. We're challenging that your surrogacy was a proper use of surrogacy, where you admit you aren't directly regulating. But what happened in the past rules was that EPA concluded that all of the listed pollutants, which include the C6, were adequately regulated. EPA could not have met its obligation under those portions of Section 112 unless it had adequately regulated all of the pollutants, including the one C6. Now, at that point, they could have come forward and said to the court, they haven't regulated POM or HCB or whatever, even though they were required to because it's a listed pollutant. And at that point, the court could have said, you don't meet the standard. Do you take that position for emission standards that were established even before you listed your C6 sources? We are because what could have happened and what did happen, to the extent that people believed the 1998 notice listing what sources they were going to do, that was answered when that public federal register notice was published. Now, Sierra Club then filed a positional HACO position saying that EPA should reopen prior rulemakings. The administrator did this so that they could address 112 C6 issues. The administrator answered that petition. Petitioners or Sierra Club then filed a petition for review, which was dismissed voluntarily. The court never considered it. So, yes, it is possible that the 1998 notice could have been viewed as a new condition or a new event warranting reopening of the old rules. But that would have happened many years ago. This debate over surrogacy is no more than an argument over whether the original rules met their obligation. Assuming we don't agree with you on that, assuming we rule that this is a timely challenge at this point based on the determination, tell us why the determination meets the standard for surrogacy. Well, the agency has, in the final rule, not made that determination. Specifically in the final rule, which petitioners talked a great deal about the proposed rule, but of course what's in front of the court is the final rule. And in the final rule, EPA said that the information in the proposed determination described the prior rulemakings and explained how the surrogate standards work. But the proposed determination did not reopen those prior standards. Thus, EPA did not take final action on determining whether or not a surrogate was viable, but instead adhered to the position that the question of whether these pollutants were regulated, be it by surrogacy or any other mechanism, was answered when the standards were promulgated and petitions for review were either not filed or not followed through. It's clear from the Sierra Club petition under Olhato, which is cited in the brief and in the record, that petitioners were aware of this issue a long time ago and could have and didn't pursue it. And so for that reason, we think that the court has to look not only at the obligations under 7412, but also has to keep in mind the general provision for timing in 7607. And it has a specific provision in it for reopening based on new information. Here, petitioners are arguing that a discussion of surrogacy in the proposal is a new event. My argument is that it is not a new event because... My most recent question is, suppose we disagree with you on that point. Have you actually justified the surrogacy? Has the administration actually justified the surrogacy? The agency did not take final action on the surrogacy question. And so what it would have to do is go back and reopen the rulemakings based on records that are not... I guess I'll just confess to you, I'm a bit baffled about how they were supposed... No. I'm sorry, Your Honor. If I could just... So if they had challenged those back then when you say they should have, how were they supposed to challenge the insufficiency of the surrogate when you never announced that's what you were doing? Because with EPA, surrogacy is another means of setting a standard. So you have the requirement that a standard be set. In some instances, they may do surrogacy. But that's just an admission. As to the things you're claiming surrogacy, that's just an admission that you didn't directly regulate those pollutants in the prior standards. I disagree with that respectfully. And also, more importantly, what I'm saying, Your Honor, is whether they use a surrogacy decision is part of setting the standards under D2. And if under D2, EPA promulgates a regulation that petitioners believe does not adequately meet all the obligations, which include the obligation to regulate the listed pollutants, which include the C6, at that point, they should have come to the court and said you didn't regulate these pollutants. And to be clear, you're saying that even before you identified that the source you're regulating is a source of the C6 pollutants? To be clear, that's your position? No. That's your pre-1998 standards? No. The standard by the statute is it has to regulate all pollutants that are listed. Regulates sources, emissions of pollutants. Under C6. But if you look, and that's part of my argument. D1D2 regulates sources, emissions. And so before EPA had even said that something was a source of polycyclic organic matter, you hadn't even done your list yet. What the sources are for that particular pollutant, they were supposed to know that even though you didn't mention it, you hadn't identified the source, and you didn't claim surrogacy, they were still supposed to know that they were going to challenge that. No. What I'm saying is that even if you look, what plaintiffs are doing is divorcing C6 from the remainder of the statute. And the remainder of the statute establishes very specific obligations. Sources are listed. This list included the ones identified by petitioners in their brief. EPA lists, well Congress listed a lot of them, as to the pollutants that should be regulated. So at that point, you had a category, and you had the pollutants. All of this had to be regulated through D2 standards. Regardless of whether it is one of the C6 pollutants, you have the same obligation. All that have submitted by the source category must be listed. That's what happened in the original rules. At that point, if petitioners believed that those standards did not adequately govern POM or whatever pollutant is at issue, they could have come back to EPA and said, you didn't meet your obligations because you didn't cover this one pollutant. At that point, EPA would have had to demonstrate to the court that it did meet that criteria, or establish a D2 standard. If EPA could not make that showing, the court would send it back. EPA at that point could have done it through surrogate. They could have explained a more direct regulation. They could have done essentially what plaintiffs are saying, or petitioners are saying they should be doing now. Again, the best illustration of that is in the petition, the administrative AHATA petition that CRF filed. That raises many of these same arguments. Again, there was a petition for review filed with this court which was dismissed. Our argument is that the underlying standards had to meet the obligation of establishing D2 standards for the pollutants listed in C6, which overlap with all the other pollutants listed. And for the same source categories, which again were subject to the prior requirements. And that if petitioners were dissatisfied with the scope of those, they could have brought it to the court. And at that juncture, if the court agreed with them, EPA would have had to go back and do further rulemaking to address, whether through surrogacy or some other method, depending on the technology, the question of whether POM was adequately regulated, for example. It's the fact that C6 did not require, did not impose additional requirements on the regulation of a specific pollutant emitted from a specific major source, than was done under subpart C, the other parts of C and D. So by doing that, any shortcomings could have been raised and presented to the court. EPA could have resulted in an explanation, could have resulted in a surrogacy determination, whatever. But it would have happened back in the time frame when the rules were published. There's nothing in the statute that suggests C6 was intended as an avenue to reopen the standards that had been promulgated over the supposed to have been 10 year period, ahead of time. It's what petitioners, although they describe it as surrogacy, what they are trying to do is use C6, which is supposed to be a summation and to include area sources where necessary to reach the threshold. They're trying to use that as an avenue to go back and investigate the adequacy of the underlying standards and whether they meet the statutory criteria. And we believe that that is contradicted to 7607, the jurisdictional limit on timing, which of course the court has to take into consideration. The surrogacy determinations that they refer to were not determinations. In the preamble to the final rule, EPA specifically disclaimed any intent to go back and reopen whether those final rules met the statutory requirements. The debate is now to somewhat extent over format, but the statutory question of whether the thresholds were met was answered back when the original rules were filed. And was, of course, I mean when I say answered, I mean answered by EPA. Anybody could have brought it to this court where they may have gotten a different answer. But it would have been years ago. The 112C6 simply does not give them a basis to ignore that statutory requirement. So they had an ample opportunity to raise these. They did not. And when the statute is considered as a whole, I believe it shows that these are questions that should have been raised, that could have been raised. The administrative petition illustrates that Sierra Club was certainly well aware enough of what was going on to present the question, which an al hotto petition is reviewable by this court. They sought review and then dismissed the petition. So even though I still have much time, excuse me, time left. Oh, I'm sorry. I'm sorry, Your Honor. I apologize. I meant to be answering the questions. Of course, yes. We asked a lot of questions. That's fine. We're trying to get your assistance. Sure. So I was getting confused by the clock. I'm sorry. Thank you, Your Honor. Thank you. All right. Any other questions for counsel? Just very quickly, I'd like to respond to opposing counsel's claim that EPA concluded in prior rules that the prior rules covered all of the 187 hazardous air pollutants listed. That's not quite what she said. Well, I believe that there was overlap between the seven listed in C6, and they're also in A. And so when EPA did these prior rules, it met, at least as far as EPA was concerned, whatever 112 required. Well, the first point I'd like to make in response is that EPA's record rationale in this determination was not that the prior rules themselves purported to set standards for the C6 pollutants. EPA's rationale in this determination in the final rule was reliance on surrogate claims. And that's on page 28 of the JA, where EPA says the emission standards that collectively satisfy the 90 percent requirement under Clean Air Act Section 112C6 were set by the EPA under two approaches. And the second approach is through standards that set emission limits for another HAP or compound, which serves as a surrogate for the Clean Air Act Section 112C6 HAP. So what's the first? Through standards that directly regulated the Clean Air Act Section 112C6 HAP. What's the argument that's being made? EPA did not claim, as to the 17 rules at issue, that it set direct D2 standards for the 112C6 pollutants. There are some they said direct, and you're not challenging those, correct? That's correct. For the 17 source categories that we are challenging, EPA claimed that it had set standards for another pollutant that it now claims is a surrogate for the 112C6 pollutants. When they say you should have looked, when those old standards came out, you should have looked at them and said, wow, this isn't getting POM. What's your answer? That the prior standards failed to set standards just shows that the prior rules failed to set standards for the 112C6 HAP just shows that they failed to set standards. It doesn't establish that EPA's determination is correct, that EPA's claim that it set standards through surrogates is correct. Does EPA have to identify, when it sets a standard, does it have to identify in that standard which pollutants it's getting? EPA has an obligation, EPA agrees it has an obligation to set D2 standards for all of the 112C6 pollutants. That's a different question than saying, does the rule itself have to put people on notice that this rule is getting this area source for these pollutants that it emits? Does it have to say which ones it thinks the standard is getting? In this rule, in this determination at the very least, EPA has to explain how the previous rules on which it's relying regulate the 112C6 HAP. And certainly, if the prior rules didn't even mention the 112C6 HAP, EPA needs to explain... Well, they just said we're getting hazardous air pollutants. And so, is your position that wasn't sufficient, that they had to... Because they talked about specific pollutants in those prior rules, which did not happen to include any discussion of things like POM. And so, they say, even though we didn't mention POM, you should have looked at that rule and said, oh, they're getting hazardous air pollutants. We should challenge it now for not discussing or capturing polycyclic organic matter to the standards we think apply. Our position is that to set a standard for a 112C6 pollutant, EPA must, at the very least, claim to be setting a standard for the 112C6 pollutant. Even if it says we've met all the requirements under 112. That's what I need to be clear on. Well, first of all, EPA did not say that in the prior rules. EPA did not claim to be setting standards for all of the 112C6 pollutants or claim to satisfy the entire statute or all of Section 112. EPA did not make that claim. Second of all... You know, you understand the qualification I put when you made that statement in your first comment on the funnel. And you're saying, in response to me, that it didn't even indicate that for the seven pollutants listed in C6, that somehow those rules, the old rules, addressed the C6. EPA says, look, in the old rules, we said we've done everything that 112 requires as to the pollutant we are now regulating. And EPA says, look at your client's own petition earlier, where it's perfectly clear they understood. Your client understood this and sought review by the administrator. It was turned down. Your client filed an appeal and then withdrew it. So by those actions, you've indicated, your client has indicated it knew precisely what it needed to do in order to make the argument that you're making today. Judge Rodgers, we knew that EPA, we knew as of around 2000, that EPA had failed to set the standards it was required to set under 112C6. And so you filed a petition with the administrator. As to... And you turned it down in that one. All right. And then you withdrew your appeal. But, I mean, my only point is, I thought we were just examining the notice issue. Because now, according to whatever it is, Chapter 7, 7607, that's what I'm trying to be clear about. What we're on notice of, and this was after the issuance of those prior rules, was that EPA had failed to comply with Section 112C6. EPA had failed to set standards for pollutants that EPA now agrees it was required to set standards for. And that's why we filed a deadline suit to compel EPA to take that mandatory action. And that's why EPA itself represented to the district court, because it didn't want the district court to inquire whether EPA had actually set standards for the 112C6 HAP, that it was going to issue this determination, and that this determination would be judicially reviewable, and that this was the place for this court to determine whether EPA had actually set the standards required by Section 112C6. So, under the language of our first appeal, we would have to conclude that this is doing something new that no one had any notice about at the time the original rules were promulgated? Well, it would be sufficient, Judge Rodders, for this court to conclude that EPA has done something new here. I guess, I mean, I'm just trying to make this as simple as possible. If an agency says we have all these obligations under 112, we're regulating for pollutant A. If you read 112, pollutant A is both in subsection A and it's in subsection C6. And it says we've done everything that's required under 112. Nobody challenges it. Well, first of all, EPA did not say that it had done everything that was required under 112A in your hypothetical example. No, no, no. I understand it didn't say it in those words, but it said we're regulating pollutant A. And in my hypothetical, pollutant A is listed in subsection A, and it's also listed in subsection C6. And so EPA says, pursuant to our obligations under 112, we're regulating pollutant A. Nobody challenges it. And then so years later, when it has to show this 90% achievement, it lists its regulation of pollutant A. If EPA had said in the prior rules that it was setting D2 standards for pollutant A, then it could... EPA required it to do that for A. In my hypothetical, just deal with my hypothetical, if you will, and I understand you can make some distinctions here. But I'm just trying to respond to what I understand EPA's argument to be. As I understand your hypothetical, EPA said in the prior rule that it was setting a standard for pollutant A, and pollutant A is also listed under section 112C6. Then in this determination, EPA could point to that rule and say, and count it. We have set a D2 standard for pollutant A. Here's where we did it, and we are taking credit for it under section 112C6. And that's all it should have said. But instead it said, is this your argument? We're relying on a surrogate? Our argument is that EPA did not say in the prior rules that it was setting standards for pollutant A. In my hypothetical... Either directly or through surrogates. Anything further? Nothing further. We would respectfully request the court to vacate the determination. Thank you. We'll take the case under advisement.
judges: Rogers, Millett, Sentelle